IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HERRIMAN CITY, a municipality, et al.,<br><br>Plaintiffs,<br><br><br><br><br>vs.<br><br><br>SHERRIE SWENSEN, as Salt Lake County Clerk; and GARY R. HERBERT, as Lieutenant Governor of the State of Utah,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR EMERGENCY RELIEF AND PERMANENT INJUNCTION<br><br><br><br><br>Case No. 2:07-CV-711 TS |

This matter comes before the Court on Plaintiffs' Motion for Emergency Relief and Permanent Injunction. Plaintiffs' seek to enjoin a ballot measure initiated by the cities of Cottonwood Heights, Sandy, Draper, and Midvale (the "Interlocal Agreement Participants"), on the question of whether a new school district (the "East Side School District") should be created within the current boundaries of the Jordan and Granite School Districts. Under the statutory scheme at issue, only the residents within the boundaries of the Interlocal Agreement Participant cities would be allowed to vote on the measure, while other voters within the current boundaries of the Jordan School District would not. Plaintiffs allege that the statutory scheme violates the

1

Equal Protection Clause of the Fourteenth Amendment by distinguishing between these two groups of voters.  Plaintiffs seek emergency relief and a permanent injunction.  For the reasons discussed below, the Court will deny Plaintiffs' Motion.

## I.  FACTUAL BACKGROUND

### A.    THE PARTIES

Plaintiff Herriman City is a city located in Salt Lake County, Utah.[1]  Plaintiff Herriman is within the boundaries of the existing school district, but would be outside of the East Side School District.  The individual Plaintiffs are individuals residing within the current boundaries of the Jordan School District, but would be excluded from voting on the creation of the East Side School District because they do not live within the  boundaries of the Interlocal Agreement Participant cities.  Defendant Swensen is the Salt Lake County Clerk who is charged with placing on the ballot the issue of whether to create the East Side School District.[2]  Defendant Herbert is the Lieutenant Governor of the State of Utah and is charged with the duty to file a certificate to create the new school district.

### B.    THE STATUTORY SCHEME

UTAH CODE ANN. §§  53A-2-118 and -118.1 provide that a new school district can be created in three ways: (1) through a citizen's initiative petition; (2) at the request of the board of the existing district or districts to be affected by the creation of the new district; or (3) at the request of a city within the boundaries of the school district or at the request of interlocal

---

[1]Defendant Swensen argues that Herriman City lacks standing and should, therefore, be dismissed, an issue not before the Court.

[2]Defendant Swensen has filed a Motion to Dismiss arguing that she is not a proper party and that Plaintiffs' Complaint should be dismissed against her.  As this Motion is not fully briefed, the Court will not rule upon it in this Order.

agreement participants, pursuant to Section 53A-2-118.1.[3]  If a new school district is to be created under one of the first two ways—citizen's initiative or school board action—the proposal is to be voted on by the legal voters of the existing school district.[4]  If, however, a school district is to be created under the third method—that is at the request of a city within the boundaries of the school district or at the request of interlocal agreement participants—the proposal is to be voted on by only the legal voters residing within the proposed new school boundaries.[5]

C.       THE INTERLOCAL AGREEMENT

On July 31, 2007, Salt Lake County entered into an interlocal agreement with the Town of Alta, Cottonwood Heights, Sandy, Draper, and Midvale to conduct a study to determine the feasability of creating the East Side School District.  The new proposed district would be detached from the east side portion of the Jordan School District and from a small portion of the Granite School District.[6]  On August 21, 2007, the Salt Lake County Council voted against a motion to enter into an interlocal agreement with these cities to place the school district detachment issue on the ballot.  The next day, August 22, 2007, the Utah State Legislature during the 2007 Special Session, passed House Bill 1002 ("H.B. 1002").  Under H.B. 1002, a group of interlocal participants may submit a detachment issue to the voters so long as the population of

---

[3] Utah Code Ann. § 53A-2-118(2)(a).

[4] *Id*. § 53A-2-118(4)(d)(I).

[5] *Id*. § 53A-2-118(5)(a)(I).

[6] The boundaries of the proposed East Side School District are: the Jordan River on the west, I-215 on the north, and the Salt Lake County boundary on the south.

3

the interlocal participants make up more than 80% of the population within the new proposed district.[7]

On August 23, 2007, the Salt Lake County Council determined that H.B. 1002 removed the need for the County's participation in the matter, so the Council took no action.  On August 27, 2007, the cities of Draper, Sandy, Midvale, and Cottonwood Heights (the "Interlocal Agreement Participants") passed an approved resolution and entered into an interlocal agreement to place the detachment issue before the voters.  On August 28, 2007, the Interlocal Agreement Participants delivered to Defendant Swensen a letter requesting that she certify the detachment issue and deliver it to the Salt Lake County Council.  That same day, Swensen delivered a letter to the Salt Lake County Council certifying the Interlocal Agreement Participant's request.  Later that same day, the Salt Lake County Council approved the request and submitted the detachment issue to Swensen for placement on the ballot for the November 6, 2007 election.

## II.  STANDARD

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[8]  "To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."[9]

---

[7] UTAH CODE ANN. § 53A-2-118.1(2)(b)(i)(D).  The population of unincorporated Salt Lake County made up less than 4% of the proposed new district.

[8] *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) (citation omitted).

[9] *General Motors Corp. v. Urban Gorilla, LLC*, --- F.3d ---, 2007 WL 2659763, *3 (10th Cir. 2007).

III.  DISCUSSION

A.    LIKELIHOOD OF SUCCESS

Plaintiffs' primary argument is that the statutory scheme discussed above violates the Equal Protection Clause of the Fourteenth Amendment.[10]  It is necessary, therefore, to discuss the Supreme Court's voter qualification jurisprudence and the state and federal cases that have followed.

1.    *Supreme Court Precedent*

In *Kramer v. Union Free School District No. 15*,[11] the Supreme Court addressed a New York law which provided that individuals may vote in school district elections only if they (1) owned (or leased) taxable real property within the district, (2) were the spouse of one who owned or leased qualified property, or (3) were parents (or had custody of) children enrolled in the local public schools.[12]  The plaintiff lived in his parents' home, within the boundaries of the school district.[13]  Since the plaintiff did not have children and did not own or lease real property, he was unable to vote in the school district elections.[14]

---

[10]Plaintiffs make brief arguments that the statutes, as applied would result in invidious discrimination and have a disproportionate impact, as well as create an economic disaster for Plaintiffs.  However, Plaintiffs have not shown a likelihood of success on these claims.

[11]395 U.S. 621 (1969).

[12]*Id*. at 623.

[13]*Id*. at 624.

[14]*Id*. at 624–25.

5

The Court stated that "state apportionment statutes, which may dilute the effectiveness of some citizens' votes receive close scrutiny . . . ."[15]  The Court went on to state that

> [n]o less rigid an examination is applicable to statutes denying the franchise to citizens who are otherwise qualified by residence and age.  Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.  Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.[16]

Therefore, when a statute denies "some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable."[17]

Under this strict standard, the Court found the New York law to be unconstitutional.[18] The Court found that the classifications involved were not narrowly tailored to achieve the state's goal.[19]  The statute included some who had little interest in school affairs while excluding others who had a direct interest in school decisions.[20]  The Court did not, however, express an opinion "as to whether the State in some circumstances might limit the exercise of the franchise to those 'primarily interested' or 'primarily affected.'"[21]

---

[15]*Id*. at 626.

[16]*Id*. at 626–27.

[17]*Id*. at 627–28 (citation omitted).

[18]*Id*. at 633.

[19]*Id*.

[20]*Id*. at 632.

[21]*Id*.

On the same day *Kramer* was decided, the Court decided *Cipriano v. City of Houma*.[22]  In *Cipriano*, the Court was called upon to determine the constitutionality of a Louisiana statute which gave only property taxpayers the right to vote in elections called to approve the issuance of revenue bonds by a municipal utility.[23]  Applying strict scrutiny,[24] the Court found that the law violated the Equal Protection Clause of the Fourteenth Amendment.[25]

The Court found that the law excluded otherwise qualified voters who were as substantially affected and directly interested in the matter voted upon.[26]  The Court held that the statute did not meet the exacting standard called for in *Kramer*.[27]

In *City of Phoenix v. Kolodziejski*,[28] the Court addressed a statute which restricted those who could vote on general obligation bonds to real property taxpayers.[29]  The Court concluded that nonproperty owners also had an interest in the issuance of general obligation bonds.[30]  Thus, there was no "basis for concluding that nonproperty owners are substantially less interested in the

---

[22]395 U.S. 701 (1969).

[23]*Id*. at 702.

[24]*Id*. at 704.

[25]*Id*. at 702.

[26]*Id*. at 706.

[27]*Id*.

[28]399 U.S. 204 (1970).

[29]*Id*. at 206.

[30]*Id*. at 212.

issuance of these securities than are property owners."[31]  Therefore, the Court ruled that the

statute violated the Equal Protection Clause.[32]

In *Hill v. Stone*,[33] the Court addressed the constitutionality of state and city laws which

limited the franchise in city bond elections to persons who were subject to taxation because of

ownership of some, real, mixed, or personal property.[34]  The Court, in reviewing its decisions in

*Kramer*, *Cipriano*, and *Kolodziejski*, noted that "[t]he basic principle expressed in these cases is

that as long as the election in question is not one of special interest, any classification restricting

the franchise on grounds other than residence, age, and citizenship cannot stand unless the

district or State can demonstrate that the classification serves a compelling state interest."[35]  The

Court found that the statutes at issue fell short of meeting the compelling state interest test

applied in the Court's previous cases and, thus, held them unconstitutional.[36]

The Court turned away from its strict scrutiny analysis in *Town of Lockport v. Citizens*

*for Community Action at the Local Level, Inc.*[37]  In *Lockport*, the Court examined a New York

law which provided that a new county charter would go into effect only if approved in a

referendum election by separate majorities of the voters who lived in the cities within the county,

---

[31]*Id.*

[32]*Id.* at 213.

[33]421 U.S. 289 (1975).

[34]*Id.* at 290–91.

[35]*Id.* at 297.

[36]*Id.* at 300–01.

[37]430 U.S. 259 (1977).

and those who lived outside the cities.[38]  The Court stated that its previous cases focused the

Court's attention on two inquiries: "whether there is a genuine difference in the relevant interests

of the groups that the state electoral classification has created; and, if so, whether any resulting

enhancement of minority voting strength nonetheless amounts to invidious discrimination in

violation of the Equal Protection Clause."[39]

In that case, the Court found that the argument that the New York law was

unconstitutional rested on the premise that all voters in New York had identical interests in the

adoption or rejection of a new charter.[40]  The Court, however, could not accept that major

premise.[41]  Rather, the Court found that the law rested on the state's identification of distinctive

interests of the cities and towns within a county, as opposed to their interests as residents of the

county as a homogeneous unit.[42]  The Court found that this distinction was consistent with the

Court's "cases that recognize both the wide discretion the States have in forming and allocating

governmental tasks to local subdivisions, and the discrete interests that such local governmental

units may have qua units."[43]

"The ultimate question then [was] whether, given the differing interests of city and

noncity voters in the adoption of a new county charter in New York, those differences are

---

[38]*Id*. at 260.

[39]*Id*. at 268.

[40]*Id*.

[41]*Id*.

[42]*Id*. at 268–69.

[43]*Id*. at 269.

sufficient under the Equal Protection Clause to justify the classifications made by New York law."[44]  The Court found that the provisions of New York law at issue merely recognized the realities of  the substantially differing electoral interests.[45]  Thus, the Court granted the law the presumption of constitutionality entitled to every duly enacted state and federal law and held that it did not violate the Equal Protection Clause of the Fourteenth Amendment.[46]

In *Holt Civic Club v. City of Tuscaloosa*,[47] the Supreme Court addressed a challenge brought by an unincorporated civic association and individual residents of the city of Holt to Alabama statutes which subjected the residents of the city of Holt to the city of Tuscaloosa's police and sanitary regulations, the criminal jurisdiction of the city's court, and the city's power to license businesses, trades, and professions, without giving the residents of the city of Holt the opportunity to vote in Tuscaloosa's elections.[48]

The Court found that a common characteristic existed in its prior voting qualification cases: "The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned."[49] The Court went on to state, however, that

> [n]o decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity

---

[44]*Id*. at 271.

[45]*Id*. at 272.

[46]*Id*. at 272–73.

[47]439 U.S. 60 (1978).

[48]*Id*. at 61–63.

[49]*Id*. at 68.

concerned, be it the State or its political subdivisions.  On the contrary, our cases have uniformly recognized that a governmental unit may legitimately restrict the right to participate in its political process to those who reside within its borders.[50]

The Court noted that internal municipal actions would have extraterritorial effects, but "no one would suggest that nonresidents likely to be affected by this sort of municipal action have a constitutional right to participate in the political processes bringing it about."[51]  Thus, the key issue in *Holt* was the "geographical boundary of the governmental unit at issue."[52]  The Court held that Plaintiffs were not within the geographical boundary of the governmental unit at issue and, therefore, the case did not fall within the parameters of the Court's previous voting rights cases.[53]

Having stripped the case of its "voting rights attire," the question became whether the Alabama statutes had a rational relationship to a legitimate state purpose.[54]  The Court, in discussing its previous case of *Hunter v. Pittsburgh*,[55] emphasized "the extraordinarily wide latitude that States have in creating various types of political subdivisions and conferring authority upon them."[56]  With this in mind, the Court held that the decision of the Alabama legislature was reasonable and that the statutes did not violate the Equal Protection Clause.[57]

---

[50]*Id*. at 68–69.

[51]*Id*. at 69.

[52]*Id*. at 70.

[53]*Id*.

[54]*Id*.

[55]207 U.S. 161 (1907).

[56]*Holt*, 439 U.S. at 71.

[57]*Id*. at 72–75.

2.      *State and Non-Supreme Court Federal Cases*

With this background in mind, the Court turns to state and lower federal court decisions which have applied the Supreme Court's voter qualification jurisprudence.  The cases of particular relevance to the question now before the Court can be roughly lumped into two separate categories: annexation cases and secession cases.

a.      *Annexation Cases*

In *Moorman v. Wood*,[58] the United States District Court for the District of Kentucky addressed a state statute which authorized any city to designate for annexation a contiguous part of another city.[59]  If there was an objection to the annexation, the matter was placed on the ballot and only those citizens of the annexation area were allowed to vote on the matter.[60]  The plaintiffs in that case were residents of the City of Covington, portions of which were to be annexed by the defendants, the cities of Ft. Wright and Crescent Springs.[61]  The plaintiffs argued that the statute was unconstitutional in that it did not allow all residents of the City of Covington to vote on the annexation matter, it only allowed those residents within the area to be annexed to

---

[58] 504 F.Supp. 467 (D. Ky. 1980).  Plaintiffs attempt to distinguish *Moorman* by arguing that the remaining school district will be forced to convey property to the East Side School District without any consideration or compensation.  This argument, however, is too speculative at this time.

[59] *Id*. at 468.

[60] *Id*.

[61] *Id*.  In actuality, *Moorman* could be viewed as a secession case because a group of citizens unhappy with being annexed into the City of Covington "formed an alliance with the smaller cities of Ft. Wright and Crescent Springs to annex them away from Covington under the new law."  *Id*. at 469–70.  Thus, various portions of Covington were attempting to break away from the city.  This aspect makes the case similar to the case before the Court.

vote.[62]  The plaintiffs argued that the citizens of the entire City of Covington would be substantially affected by the loss of areas of that city and that depriving them of the right to vote was unconstitutional.[63]

The court noted "that the right to vote could be limited to the residents of the governmental unit or area concerned."[64]  The court found that in cases "granting the franchise to residents of one area, and denying it to those of another area, or giving the votes of different areas different weight, the less stringent rational basis test is the test that has been employed."[65]  The court held that "annexation elections are special interest elections, and that there [was] not only a rational basis, but a compelling state interest for limiting the right to vote in them to the residents of the annexation area."[66]  The court found that while others may have an interest in the outcome of the annexation decision, it would be impossible to permit everyone who is affected by the election to vote.[67]  "Therefore, in the context of most elections the limitation of the franchise to residents satisfies a compelling state interest per se."[68]  The court also found it

---

[62]*Id*. at 468.

[63]*Id*. at 473.

[64]*Id*. at 473–74.

[65]*Id*. at 474.

[66]*Id*.  Plaintiffs attempt to distinguish *Moorman* because the court did not determine whether it would apply a rational basis or strict scrutiny test and the court emphasized that the issue before the court was novel.  It is clear, however, that the court held that even under the strict scrutiny test, the statute was constitutional.

[67]*Id*. at 475–76.

[68]*Id*. at 476.

important that this was a single-shot referendum election.[69]  Thus, the Court held that the statute did not violate the Equal Protection Clause.[70]

In *St. Louis County v. City of Town and Country*,[71] the court addressed a Missouri statute which provided that in an annexation election, the annexation must be approved by a majority of those voting who reside in the annexing municipality and by a separate majority of those voting who reside in the unincorporated territory to be annexed.[72]  Those residing within the unincorporated area of the Court were not allowed to vote, unless they resided within the territory to be annexed.[73]

The court began its analysis by determining the applicable standard of review,[74] holding that "[a] compelling state interest is necessary only to justify the infringement of a fundamental right or the creation of a suspect classification."[75]  The court found, based on the Supreme Court's decision in *Holt*, that "[t]hose who reside outside the jurisdiction here do not have [a] constitutional right to vote, so a compelling state interest need not be shown for not allowing

---

[69]*Id.  See also Lockport*, 430 U.S. at 266 ("The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives are of limited relevance, however, in analyzing the propriety of recognizing distinctive voter interests in a 'single-shot' referendum.").

[70]*Moorman*, 504 F.Supp. at 477.

[71]590 F.Supp. 731 (E.D. Mo. 1984).

[72]*Id*. at 733–34.

[73]*Id*. at 734.

[74]*Id*. at 736.

[75]*Id*. at 737.

them to vote."[76]  Having found that no fundamental right was abridged, a compelling state interest was not necessary, only a rational basis.[77]

In discussing various annexation election cases, the court outlined several reasons that courts have not required more that a rational basis.  First, states have considerable discretion in structuring political subdivisions.[78]  Second, annexation elections serve only a limited purpose.[79] Third, geographic residence restrictions in annexation elections are not invidious discrimination, so long as a rational basis exists.[80]

The court found that those reasons were equally applicable in that case and, thus, only a rational basis was required.[81]  The court found that a rational basis did exist.[82]  The court found that it was legitimate for the legislature to limit the vote to those it believed would be most directly affected by the annexation.[83]  The legislature could have rationally determined that the residents of the annexing municipality and the area to be annexed would be most directly affected by annexation and could, thus, limit the vote to those individuals.[84]  Therefore, the court

---

[76]*Id*. at 738.

[77]*Id*.

[78]*Id*.

[79]*Id*.

[80]*Id*.

[81]*Id*.

[82]*Id*.

[83]*Id*. at 738–39.

[84]*Id*. at 739.

held that the residents of the unincorporated area of the county were not denied equal protection as a result of being unable to vote in the annexation elections.[85]

   b. *Secession Cases*

   Unlike the annexation case discussed above, secession cases address situations, like here, where a certain portion of a political subdivision seeks removal from the rest of the political subdivision.  Arguably the most similar case to the case before the Court is a plurality opinion issued by the Supreme Court of California in 1982, *Fullerton Joint Union High School District v. State Board of Education*.[86]  *Fullerton* involved the community of Yorba Linda, which had its own elementary school district, but was part of the Fullerton Joint Union High School District (the "Fullerton HSD").[87]  The State Board of Education (the "State Board") approved a plan to create a new Yorba Linda Unified School District and transfer responsibility for high school education of Yorba Linda students from the Fullerton HSD to the new district.[88]  The State Board directed that the proposal be submitted for approval in an election which was limited to the residents of Yorba Linda.[89]  The Fullerton HSD brought suit seeking to prevent the election.  The

---

[85]*Id.* at 740.  *Accord Givorns v. City of Valley*, 598 So.2d 1338, 1340–41 (Ala. 1992) (upholding under rational basis test statute which limited franchise to qualified voters living within boundaries of area to be annexed).

[86]654 P.2d 168 (Cal. 1982).

[87]*Id.* at 170.

[88]*Id.*

[89]*Id.*

Fullerton HSD argued, *inter alia*, that the decision to limit the vote to Yorba Linda residents denied the equal protection of the laws to the other residents of the Fullerton HSD.[90]

The court, relying on the Supreme Court decisions of *Kramer* and *Kolodziejski* held that the State Board's decision was subject to strict scrutiny.[91]  The court held that the Supreme Court cases of *Lockport* and *Holt* did not relieve the statute of this higher standard.  The court concluded that *Lockport* did not "support the proposition that geographical restrictions on the franchise are immune from scrutiny."[92]  "But nothing in *Lockport* endorse[d] measures which deny the vote entirely to residents of one of the areas, nor permits such measures to escape strict judicial scrutiny."[93]  The court went on to state that, in its view, *Holt* held "only that distinctions which coincide with the boundaries of the governmental entity concerned, and exclude no one physically resident within those boundaries, do not require strict scrutiny.  If, on the other hand, the state attempts to carve up the existing political entity and deny the vote to some of its residents . . . then strict scrutiny is still required."[94]

---

[90]*Id.*

[91]*Id.* at 186.

[92]*Id.* at 183.

[93]*Id.*

[94]*Id.* at 184.

The court held that in that case strict scrutiny applied to the State Board's decision.[95]   The court found that there was no compelling interest to treat Yorba Linda residents differently from the residents of the remainder of the Fullerton HSD.[96]

> In sum, we do not view the classification at issue here as one which separates interested and uninterested voters, but one which divides two groups, each with a substantial although different interest in the election.  In such a case the state has no compelling interest to grant the franchise to one group and deny it to the other. We therefore conclude that the decision of the State Board, to the extent that it excluded Fullerton HSD residents from voting at the election to approved the proposed secession of Yorba Linda from the Fullerton HSD denied such residents the equal protection of the laws.[97]

A mere ten years later, however, the California Supreme Court revisited its decision in *Fullerton*.  In *Board of Supervisors v. Local Agency Formation Commission*,[98] residents of an unincorporated area of Sacramento County sought to incorporate into a city.[99]  California law provided that only voters residing in the territory to be incorporated could vote to confirm incorporation.[100]

The court noted that "[w]hen a law impinges on certain fundamental rights—and the right to vote may be the most fundamental of all—it will ordinarily be subject to strict judicial

---

[95]*Id*. at 186.

[96]*Id*. at 187.

[97]*Id*. at 186–87.

[98]838 P.2d 1198 (Cal. 1992).  Plaintiffs attempt to distinguish *Bd. of Supervisors* because of the unique background in which the statutory scheme at issue there arose.  While the background of any case must be closely examined, the Court finds Plaintiffs' attempts unavailing.

[99]*Id*. at 1199–1200.

[100]*Id*. at 1200.

scrutiny."[101]  "For most legislation, however, a court will apply the rational basis test."[102]  The court found that the law at issue touched upon the right to vote.[103]  "The mere fact, however, that a state law touches on the right to vote does not necessarily require the application of strict scrutiny."[104]  Rather, the court held, strict scrutiny need only "be applied if a classification has a real and appreciable impact upon the equality, fairness and integrity of the electoral process."[105]  The court, in examining the Supreme Court precedents discussed above, concluded that the statute's impact fell well short of the real and appreciable impact standard.[106]

In discussing *Fullerton*, the court noted that the decision in *Fullerton* was a plurality opinion and thus lacked authority as precedent.[107]  Additionally, the court placed emphasis on the concern in *Fullerton* that failure to apply strict scrutiny could result in racial segregation.[108]  The court went on to note that no case had cited *Fullerton* with approval.[109]  For these reasons, the court refused to apply *Fullerton*.

---

[101]*Id*. at 1204 (citation omitted).

[102]*Id*.

[103]*Id*.

[104]*Id*.

[105]*Id*. (quotation marks and citations omitted).

[106]*Id*. at 1205.

[107]*Id*. at 1207.

[108]*Id*.

[109]*Id*. at 1210 n.10.

Giving the statute the presumption of constitutionality to which every statute is entitled,[110] the court upheld the statute using a rational basis test.[111]  The court found that the legislature had a legitimate purpose of encouraging orderly growth and development.[112]  The statue, by limiting the election to those who were most interested, was rationally related to that purpose.[113]

Another related case concerns the secession of Staten Island from New York City.[114]  A New York law provided a process by which the Borough of Staten Island could be separated from the City of New York and be established as a new City of Staten Island.[115]  The statute provided for a referendum in which only the residents of Staten Island would vote on whether a commission of only Staten Islanders should be created to draft a proposed charter for a proposed City of Staten Island independent of the City of New York.[116]  If there was a majority affirmative vote, a second referendum would follow in which only Staten Islanders would vote on whether the proposed charter should be adopted.[117]  If the second referendum resulted in a majority affirmative vote, then the commission was to prepare proposed legislation enabling the borough

---

[110]*Id*. at 1211.

[111]*Id*.

[112]*Id*.

[113]*Id*.

[114]*City of New York v. State*, 557 N.Y.S.2d 914 (N.Y. Sup. Ct. 1990), *aff'd*, 561 N.Y.S.2d 154 (N.Y. 1990).

[115]*Id*. at 915.

[116]*Id*.

[117]*Id*.

of Staten Island to disengage and separate from the city of New York.[118]  The final step would be

enactment of such enabling legislation.[119]

The court, in rejecting *Fullerton*, stated that "we do not read the decisions of the United

States Supreme Court as mandating that in referenda affecting territorial boundaries, the

residents of the bulk of the affected political subdivision must be given, through the franchise, an

equal opportunity to veto a proposed boundary change."[120]  "In a 'single-shot' referendum, the

issue to be submitted to the electorate must be analyzed in terms of whether its adoption or

rejection will have a disproportionate impact, or be of special interest, to an identifiable group of

voters.  If such is the case, and the classification between those who are specially interested and

those who are not is reasonably precise, the latter class may be validly excluded from the

franchise."[121]  "Moreover, classifications based on geographical location of residency, as opposed

to property ownership, for example, are, along with age and citizenship, among the most

acceptable bases of differentiation."[122]  "Given the extraordinarily wide latitude that states are

given in the creation of various types of political subdivisions, the State can legitimately adopt a

---

[118]*Id*.

[119]*Id*.  Plaintiffs place great emphasis on the fact that the Staten Islander's decision did not result in detachment from New York City.  Detachment only resulted from further legislation. Despite this difference, the fact remains that the statute at issue gave the right to vote to one group of citizens and not another based on geographic area.  The court, applying a rational basis standard, held that the classification at issue did not violate the Equal Protection Clause.

[120]*Id*. at 917.

[121]*Id*.

[122]*Id*.

geographic classification based upon the boundaries of a proposed new political subdivision to be created if approved by the electorate of the smaller, but significant, separating community."[123]

The court held that the fact that only Staten Islanders would be subject to the governmental powers of a City of Staten Island, along with the state's interest in facilitating self-determination, justified a classification that prevented the other residents of New York City from exercising a veto power over the question of secession.[124]  Thus, the court found that the law was not unconstitutional.[125]

3.      *Analysis*

Under *Kramer* and its progeny, it is clear that any law which denies the vote to certain residents of the relevant jurisdiction, while allowing others to vote, is subject to strict scrutiny. Under *Holt*, however, it is equally clear that the "one man, one vote" rule has never been extended to those outside of the relevant geographic area, regardless of extraterritorial concerns. Thus, states are free to restrict elections to those who reside within the relevant jurisdiction and statutes which do so are only subject to a rational basis review.  Additionally, both *Holt* and *Hunter* recognize that states are given wide latitude to create political subdivisions and confer authority upon them.[126]

---

[123]*Id.*

[124]*Id.*

[125]*Id.*

[126]*Mixon v. State*, 193 F.3d 389, 405 (6th Cir. 1999) ("The lesson of *Holt* and *Kramer* is an important one: If residents of the relevant jurisdiction are excluded from participation, as in *Kramer*, then the court subjects the legislation to strict scrutiny.  If, however, the legislation merely concerns extraterritorial jurisdiction over non-residents, courts employ rational basis review, granting the States wide latitude to create political subdivisions and exercise state legislative power.").

The Court finds that the statutory scheme in question here is one which restricts the vote to those who reside within the relevant jurisdiction.  Those outside the relevant jurisdiction do not have a constitutional right to vote on the creation of the new district.  As a result, the statutory scheme is subject to a rational basis review.  This conclusion is supported by the recent voter qualification cases, all of which, with the exception of *Fullerton*, have applied the rational basis standard.[127]  As noted above, the *St. Louis County* court pointed to three reasons why no more than a rational basis was required in such cases.

> First, under *Hunter v. Pittsburgh*, *supra*, states have considerable discretion in structuring political subdivisions and annexation elections are part of the process for determining boundaries.  Second, annexation elections serve only a limited purpose, the alteration of boundaries, thus leaving other governmental decisions to be made at other times.  Third, geographic residence restrictions in annexation elections are not invidious discrimination (at least if a rational basis exists), for such restrictions are not based on an extraneous condition such as race, wealth, tax status and the like.[128]

These reasons are equally applicable here.  First, as recognized by *Hunter* and reaffirmed in *Holt*, the state has wide discretion in structuring political subdivisions.  Second, this election is a limited one.  There is only one issue facing the voters: whether a new school district should be created.  This is not a general interest election, such as electing school board members.  Third, the distinction made here is based on geographic residence, not an improper consideration, such as race, wealth, tax status, or other considerations.  For all of these reasons, the rational basis test is applicable here.

---

[127]*St. Louis County*, 590 F.Supp. at 738 (applying rational basis standard); *Moorman*, 504 F.Supp. at 474 (same); *Board of Supervisors*, 838 P.2d at 1205) (same); *Givorns*, 598 So.2d at 1340 (same); *City of New York*, 557 N.Y.S.2d at 917 (same).  *But see Fullerton*, 654 P.2d at 186 (applying strict scrutiny).

[128]*St. Louis County*, 590 F.Supp. at 738.

Under the rational basis test, the question becomes whether the statutory scheme at issue bears some rational relationship to a legitimate state purpose.[129]  It is a legitimate purpose for the state to distinguish between the different interests of the geographic areas involved here and to limit franchise to those who are most affected.[130]  Thus, it must be determined whether the statutory scheme developed by the state bears a rational relationship to this legitimate purpose. The Court finds that a rational basis exists for several reasons

First, as noted above, the state has wide discretion in the creation of the political subdivisions.[131]  This broad discretion was first noted by the Supreme Court in *Hunter*.  While the Court had softened the broad language in *Hunter* in subsequent cases, the Court reaffirmed this basic principle in *Holt*.  The *Holt* Court emphasized "the extraordinarily wide latitude that States have in creating various types of political subdivisions and conferring authority upon them."[132]

Second, the legislature could rationally determine that the residents of the proposed new school district are most directly affected by the creation of the new district and, therefore, limit the vote to those residents.[133]  If a new school district is created, the citizens of the new school

---

[129]*Holt*, 439 U.S. at 70.

[130]*St. Louis County*, 590 F.Supp. at 739 ("It is a legitimate purpose for [the state] to distinguish between the different interests of the geographic areas involved in annexations.").

[131]*Hunter*, 207 U.S. at 178; *Holt*, 439 U.S. at 71.

[132]*Holt*, 439 U.S. at 71.

[133]*See, e.g., St. Louis County*, 590 F.Supp. at 739 ("The legislature could have rationally determined that residents of the annexing municipality and the area to be annexed are most directly affected by an annexation."); *Givorns*, 598 So.2d at 1340 ("A rational basis for the restriction in the challenged statute exists.  The franchise was limited to residents in the area annexed because it was rationally determined that this area would be the area most directly

district will be given the task of creating that new district.  Further, only the residents of the new

school district will be subject to the decisions of the district.[134]  Thus, the statutory scheme does

no more than recognize the different electoral interests involved and limits the vote to those who

are most greatly affected.[135]  It is true, as Plaintiffs set forth in their Motion, that any decision to

create a new school district, be it through citizen initiative, school board action, or an agreement

between cities, will have certain ramifications on those district citizens that are not part of the

new district.  However, such extraterritorial effects are not sufficient to require the franchise to

be extended to those living outside the territory of those cities involved in the decision to create

the new school district.[136]  While it may have been better for the legislature to expand the

geographic area to include all residents of the existing district, this is a question best left to the

legislature, not the Court.[137]

---

affected.").

[134]*See City of New York*, 557 N.Y.S.2d at 917.

[135]*Lockport*, 430 U.S. at 272.  *See also City of New York*, 557 N.Y.S.2d at 917 ("In a 'single shot' referendum, the issue to be submitted to the electorate must be analyzed in terms of whether its adoption or rejection will have a disproportionate impact, or be of special interest, to an identifiable group of voters.  If such is the case, and the classification between those who are specially interested and those who are not is reasonably precise, the latter class may be validly excluded from the franchise.").

[136]*See Holt*, 439 U.S. at 69.

[137]*Holt*, 439 U.S. at 73–74 ("From a political science standpoint, [Plaintiffs'] suggestions may be sound, but this court does not sit to determine whether [the state] has chosen the soundest or most practical form of internal government possible.  Authority to make those judgments resides in the state legislature, and [state] citizens are free to urge their proposals to that body."); *see also Board of Supervisors*, 838 P.2d at 1211 ("It's not a question of what would be the perfect arrangement as a matter of political science; it's what the Constitution requires.").

Finally, the statutory scheme is rationally related to the improvement of education through the promotion of community-based schools.[138]  The statutory scheme provides individual communities the ability to take control of their educational system and administer it in such a way that it is more responsive to the needs of their community.  By limiting the vote to those citizens who reside within the proposed new district, the statute promotes the creation of such community-based schools.  Allowing non-residents an opportunity to vote concerning the creation of the new district would not promote this goal.

Based on the above, Plaintiffs have failed to show a reasonable likelihood of success on their Equal Protection claim.

B.      OTHER PRELIMINARY INJUNCTION ELEMENTS

As the remaining factors hinge on Plaintiffs showing a reasonable likelihood of success on the merits of their claim, Plaintiffs have not met the remaining elements necessary for the issuance of injunctive relief.

IV.  CONCLUSION

Plaintiffs have not established a reasonably likelihood of success on their constitutional claim.  Additionally, Plaintiffs have not established the remaining elements because they hinge on Plaintiffs' constitutional claims.

---

[138]The Proposed Intervenors state that there are a number of advantages to having community-based schools, including: promoting closer cooperation between the school district and the city; discouraging double taxation; promoting long-term community-based planning; reducing the cost of overlapping city and school district programs; and promoting economic development.  Docket No. 16, at 7.

It is therefore

ORDERED that Plaintiff's Motion for Emergency Relief and Permanent Injunction (Docket No. 2) is DENIED.

DATED   October 11, 2007.

BY THE COURT:

_____
TED STEWART
United States District Judge