IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HERRIMAN CITY, a municipality, et al.,<br><br>        Plaintiffs, | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' AND INTERVENOR DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING MOTIONS TO STRIKE, AND DENYING INTERVENOR DEFENDANTS' MOTION FOR ATTORNEY'S FEES |
| vs. | |
| SHERRIE SWENSEN, as Salt Lake County Clerk; and GARY R. HERBERT, as Lieutenant Governor of the State of Utah,<br><br>        Defendants. | Case No. 2:07-CV-711 TS |
| COTTONWOOD HEIGHTS CITY, SANDY CITY, DRAPER CITY, and CITY OF MIDVALE,<br>        Intervenor Defendants. | |

This matter is before the Court on cross motions for summary judgment concerning the constitutionality of a state statutory scheme which provides the mechanism for the creation of a new school district. For the reasons discussed below, the Court finds that the statutory scheme at issue is constitutional and, as a result, will deny Plaintiffs' Motion for Summary Judgment and will grant judgment on behalf of Defendants and Intervenor Defendants. Additionally, the Court will deny the various motions to strike filed in relation to these motions and will deny Intervenor Defendants' Motion for Attorney's Fees.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[1]  In considering whether genuine issues of material fact exist, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[2]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[3]

## II.  FACTUAL BACKGROUND

The facts surrounding this case are largely undisputed.  This action arises out of the recent creation of a new school district (the "East Side School District") within the previous boundaries of the Jordan and Granite School Districts.  The creation of the new school district

---

[1]Fed. R. Civ. P. 56(c).

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[3]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);  *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

was facilitated by a ballot measure initiated by the cities of Cottonwood Heights, Sandy, Draper, and Midvale (the "Interlocal Agreement Participants" or "Intervenor Defendants").  That ballot measure was made possible because of the statutory scheme at issue in this case.  Under the statutory scheme, only eligible voters within the boundaries of the Interlocal Agreement Participant cities were allowed to vote on the measure, while other voters within the previous boundaries of the Jordan School District were not.  Plaintiffs argue that the statutory scheme violates the Equal Protection Clause of the Fourteenth Amendment.

A.     THE PARTIES

Plaintiff Herriman City is a city located in Salt Lake County, Utah.  Plaintiff Herriman is within the boundaries of the previous Jordan School District, but is outside of the East Side School District.  The individual Plaintiffs are individuals residing within the previous boundaries of the Jordan School District, but were excluded from voting on the creation of the East Side School District because they did not live within the boundaries of the Interlocal Agreement Participant cities.  Defendant Swensen is the Salt Lake County Clerk who was charged with placing on the ballot the issue of whether to create the East Side School District.  Defendant Herbert is the Lieutenant Governor of the State of Utah and is charged with the duty to file a certificate to create the new school district, which was done on December 19, 2007.  The Intervenor Defendants are the City of Cottonwood Heights, Sandy City, Draper City, and Midvale City.  As discussed below, the Intervenor Defendants were participants in the Interlocal Agreement.

B.     THE STATUTORY SCHEME

In 2006, the Utah State Legislature enacted a statute concerning the creation of new school districts in Utah.  Utah Code Ann. §§ 53A-2-118 and -118.1 provide that a new school

district can be created in one of three different ways: (1) through a citizen's initiative petition; (2) at the request of the board of the existing district or districts to be affected by the creation of the new district; or (3) at the request of a city within the boundaries of the school district or at the request of interlocal agreement participants, pursuant to Section 53A-2-118.1.[4]  If a new school district is to be created under one of the first two ways—citizen's initiative or school board action—the proposal is to be voted on by the legal voters of the existing school district.[5]  If, however, a school district is to be created under the third method—that is, at the request of a city within the boundaries of the school district or at the request of interlocal agreement participants—the proposal is to be voted on by only the legal voters residing within the proposed new school boundaries.[6]

C.      THE INTERLOCAL AGREEMENT

On July 31, 2007, Salt Lake County entered into an interlocal agreement with the Town of Alta, Cottonwood Heights, Sandy, Draper, and Midvale to conduct a study to determine the feasability of creating a new school district within the then-existing boundaries of the Jordan School District.  The new proposed district would detach itself from the west side portion of the Jordan School District and from a small portion of the Granite School District.  On August 21, 2007, the Salt Lake County Council voted against a motion to enter into an interlocal agreement with these cities to place the school district detachment issue on the ballot.  The next day, August 22, 2007, the Utah State Legislature during the 2007 Special Session, passed House Bill 1002

---

[4] UTAH CODE ANN. § 53A-2-118(2)(a).

[5] *Id*. § 53A-2-118(4)(d)(I).

[6] *Id*. § 53A-2-118(5)(a)(I).

("H.B. 1002"), which amended Utah Code Ann. § 53A-2-118.1.  Under the amendment, a group of interlocal participants could submit a detachment issue to the voters so long as the population of the interlocal participants make up more than 80% of the population within the new proposed district.[7]

On August 23, 2007, the Salt Lake County Council determined that H.B. 1002 removed the need for the County's participation in the matter, so the Council took no action.  On August 27, 2007, the cities of Draper, Sandy, Midvale, and Cottonwood Heights passed an approved resolution and entered into an interlocal agreement to place the detachment issue before the voters.  On August 28, 2007, the Interlocal Agreement Participants delivered to Defendant Swensen a letter requesting that she certify the detachment issue and deliver it to the Salt Lake County Council.  That same day, Swensen delivered a letter to the Salt Lake County Council certifying the Interlocal Agreement Participant's request.  Later that same day, the Salt Lake County Council approved the request and submitted the detachment issue to Swensen for placement on the ballot for the November 6, 2007 election.

D.    THIS ACTION AND THE ELECTION

Plaintiffs filed the instant action on September 24, 2007, seeking a declaration that the statutory scheme was unconstitutional, as well as injunctive relief.[8]  Plaintiffs also filed a Motion

---

[7] UTAH CODE ANN. § 53A-2-118.1(2)(b)(i)(D).  The population of unincorporated Salt Lake County made up less than 4% of the proposed new district.

[8] Docket No. 1.  Plaintiffs filed an Amended Complaint on January 28, 2008, setting forth essentially the same facts and causes of action, but adding additional allegations concerning future elections.  *See* Docket No. 55.

for Emergency Relief and Permanent Injunction,[9] which the Court denied on October 9, 2007.[10]
As a result of the Court's decision, the election on the creation of the East Side School District
proceeded as scheduled. The voters then voted to create a new school district. On December 19,
2007, Defendant Herbert filed a Certificate of Creation in compliance with Utah Code Ann. §
53A-2-101.5.

## III.  DISCUSSION

### A.      MOOTNESS

The Court must first resolve Defendants' contention that this case is now moot because
the election has been conducted.

"In general a case becomes moot when the issues presented are no longer live or the
parties lack a legally cognizable interest in the outcome."[11]  An exception to this general rule
occurs in cases which are deemed to be "capable of repetition, yet evading review."[12]
Application of this exception is "limited to the situation where two elements combine[]: (1) the
challenged action [is] in its duration too short to be fully litigated prior to its cessation or
expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be
subjected to the same action again."[13]  "Election cases often fall within this exception, because

---

[9]Docket No. 2.

[10]Docket No. 20.  *See Herriman City v. Swensen*, 521 F.Supp. 2d 1233 (D. Utah. 2007).

[11]*Murphy v. Hunt*, 455 U.S. 478, 481 (1982).

[12]*Id*. at 482 (quotation omitted).

[13]*Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).

6

the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits."[14]

The Court finds that this case falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. It is undisputed that the challenged action—the November election—was too short in duration to be fully litigated prior to its cessation or expiration. As noted, Plaintiffs filed their Complaint on September 24, 2007, challenging the November election. While this case has been litigated rather quickly, full litigation on the merits was simply not possible before the election.

Further, there is a reasonable expectation that Plaintiffs will be subjected to the same action again. As noted by Plaintiffs, other areas within the remaining portion of the Jordan School District have considered or are currently considering whether to create their own school districts.[15] If a city or group of cities decided to create a new district within the remaining Jordan School District, Plaintiffs would again be precluded from participating in the election on that issue. This is the same allegedly unconstitutional action which Plaintiffs are complaining of here. Based on the above, the Court finds that Plaintiffs' claims are not moot. While the November election has passed, the wrongs of which Plaintiffs complain are capable of repetition, yet evading review.

---

[14]*Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003). *See also Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (finding that while the challenged election was over, the case was not moot because the controversy was capable of repetition, yet evading review); *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (same).

[15]*See* Docket No. 55, ¶¶ 44–52.

B.     ELEVENTH AMENDMENT

Defendants Swensen and Herbert also argue that they are not proper parties.  Defendants essentially argue that they are entitled to sovereign immunity under the Eleventh Amendment.[16] This argument is based on Defendants' contention that now that the election has taken place, Plaintiffs may obtain no prospective injunctive relief from Defendants.  Defendants, however, read Plaintiffs' Amended Complaint too narrowly.

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[17] The Eleventh Amendment "generally bars suits brought by individuals against state officials acting in their official capacities."[18]  Under *Ex Parte Young*,[19] however, "[t]he Eleventh Amendment does not bar a suit against state officials in their official capacities if it seeks prospective relief for the officials' ongoing violation of federal law."[20]  "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only

---

[16]While Defendant Swensen does not make precisely this argument, the Court construes her argument that she is not a proper party as one under the Eleventh Amendment.

[17]U.S. Const. amend XI.

[18]*Harris v. Owens*, 264 F.3d 1282, 1289 (10th Cir. 2001).

[19]209 U.S. 123 (1908).

[20]*Harris*, 264 F.3d at 1290.

conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"[21]

The Court applies a four-part framework to determine whether the *Ex Parte Young* doctrine governs a case.[22]

> First, we determine whether the action is against state officials or the state itself. Second, we look at whether the alleged conduct of the state officials constitutes a violation of federal law.  Third, we assess whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages impacting the state treasury.  Finally, we analyze whether the suit rises to the level of implicating "special sovereignty interests."[23]

This case falls within the exception to the Eleventh Amendment recognized in *Ex Parte Young*.  First, this action is against state officials.  It is undisputed that Defendants Herbert and Swensen are state officials and that this suit has been brought against them in their official capacity.

Second, Plaintiffs' Amended Complaint alleges that Defendants' conduct violates their rights under the Equal Protection Clause of the Fourteenth Amendment.  Under this second prong, the Court need only "determine whether Plaintiffs state a non-frivolous, substantial claim for relief against the State officers that does not merely allege a violation of federal law 'solely for the purpose of obtaining jurisdiction.'"[24]  Here, Plaintiffs' Amended Complaint sufficiently

---

[21]*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)).

[22]*Robinson v. Kansas*, 295 F.3d 1183, 1191 (10th Cir. 2002).

[23]*Id.* (quoting *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205 (10th Cir. 2002)).

[24]*Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 866 (10th Cir. 2003) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 n.10 (1949)).

sets forth a non-frivolous, substantial claim for relief.  Plaintiffs allege that Defendants are enforcing the law in a manner which violates their Equal Protection rights.

Third, Plaintiffs are seeking prospective injunctive relief.  It is true, as Defendant Herbert claims, that Plaintiffs' claims for prospective injunctive relief with respect to the November election are now moot.  However, Plaintiffs' Amended Complaint seeks more than the limited relief suggested by Defendant Herbert.  In particular, Plaintiffs request "an Order enjoining the Defendants from certifying and conducting the June 2008 election *or any other elections from proceeding unless and until the election conforms to the requirements of the United States Constitution*."[25]  Plaintiffs also request an "Order enjoining the Defendants from taking any actions violative of the Plaintiffs' rights guaranteed under the Constitution of the United States."[26]  From this it is clear that Plaintiffs are seeking prospective relief relating to future elections, not a retroactive award of damages impacting the state treasury.[27]

Finally, Defendants have not claimed that Plaintiffs' suit implicates special sovereignty interests.  From this, the Court finds that Defendants are not entitled to sovereign immunity under the Eleventh Amendment.

C.     STANDING - HERRIMAN CITY

Defendants argue that Plaintiff Herriman City lacks standing and is not a proper party.  It is well established that a political subdivision lacks standing to challenge the constitutionality of

---

[25]Docket No. 55, at 21 (emphasis added).

[26]*Id.*

[27]*Robinson*, 295 F.3d at 1191 ("It is also clear that the relief sought, upon amendment of plaintiffs' complaint, is permissible prospective relief: an injunction barring state officials from enforcing [a state law] in a manner that violates federal law.").

a state statute under the Fourteenth Amendment.[28]  Likewise, a political subdivision may not

challenge the validity of an act by a fellow political subdivision under the Fourteenth

Amendment unless such an action is expressly authorized.[29]  As a suit against a state official in

his or her official capacity is no different from a suit against the state itself,[30] this logic applies

equally to Defendants here.[31]  Thus, Herriman City may not maintain this action against these

Defendants.[32]  Despite this, the Court will allow Herriman City to intervene under Fed.R.Civ.P.

24(b) and will consider the arguments set forth in its briefs.

D.      FOURTEENTH AMENDMENT CLAIMS

Plaintiffs challenge the statutory scheme under the Equal Protection Clause of the

Fourteenth Amendment both on its face and as applied.  The Court will address each of these

challenges in turn.

---

[28]*See Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998); *Housing Authority of the Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991); *City of Moore v. Atchison, Topeka & Santa Fe R. Co.*, 699 F.2d 507, 511–12 (10th Cir. 1983).

[29]*Kaw Tribe*, 952 F.3d at 1190.

[30]*See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.").

[31]*See Romer*, 161 F.3d at 628 (assuming argument relating to political subdivision standing was properly presented in a case where the political subdivision had not sued the state, bur rather sued several state officials in their official capacities).

[32]Plaintiffs have abandoned their seventh claim for relief which alleges violations of various disability statutes.  Thus, the Court need not consider whether Herriman City may maintain an action relating to the disability statutes set forth therein.

    *1.    Facial Challenge*

Plaintiffs' primary argument is that the statutory scheme violates the Equal Protection Clause of the Fourteenth Amendment by limiting the right to vote to those eligible voters residing in the boundaries of the Interlocal Agreement Participant cities, rather than the entire school district.  The Court construes this as a facial challenge to the statutory scheme.

The Court, in its October 11, 2007 Memorandum Decision and Order Denying Plaintiffs' Motion for Emergency Relief and Permanent Injunction ("Injunction Order"),[33] set forth a detailed review of the relevant law in this area.[34]  The Court incorporates that discussion into this Order.

In the Injunction Order, the Court noted that "states are free to restrict election to those who reside within the relevant jurisdiction and statutes which do so are only subject to a rational basis review."[35]  Because the statutory scheme was "one which restricts the vote to those who reside within the relevant jurisdiction,"[36]  the Court found that the statutory scheme was subject to a rational basis review.[37]  Three considerations bolstered this conclusion.  First, the state has wide discretion in structuring political subdivisions.[38]  Second, the election on the creation of the

---

[33]Docket No. 20.  *See Herriman City v. Swensen*, 521 F.Supp. 2d 1233 (D. Utah. 2007).

[34]*Herriman City*, 521 F.Supp. 2d at 1236–45.

[35]*Id*. at 1245.

[36]*Id*.

[37]*Id*.

[38]*Id*.

new school district was a limited one.[39]  Third, the distinction made between those who were

allowed to vote and those who were not was based on geographic residence, not an

impermissible factor.[40]  For those reasons, rational basis review was the appropriate level of

review.[41]

The Court concluded that the statutory scheme would likely survive a rational basis

review for a number of reasons.[42]  First, the state has wide discretion in the creation of political

subdivisions.[43]  Second, the legislature could rationally determine that the residents of the new

school district are most directly affected by the creation of the new district and that the election

could be limited to those individuals.[44]  Finally, the Court held that the statutory scheme was

rationally related to a legitimate state purpose, namely the improvement of education through

community-based schools.[45]  The Court adopts those findings and conclusions into this Order.

Plaintiffs' most compelling argument that the statutory scheme fails the rational basis test

on its face is that there is no rational basis to distinguish between the creation of a new school

district by school board action or citizen initiative and one created at the request of interlocal

agreement participants.  As noted above, the statutory scheme provides three ways in which a

---

[39]*Id.*

[40]*Id.* at 1246.

[41]*Id.*

[42]*Id.*

[43]*Id.*

[44]*Id.*

[45]*Id.* at 1247.

new school district may be created: citizen initiative, school board action, and at the request of a city or interlocal agreement participants.  Plaintiffs argue that there is no rational reason to allow the entire district to vote when a school district is to be created by a school board action or citizen initiative, but restrict the right vote when a school district is created at the request of a city or interlocal agreement participants.

The Supreme Court has recognized that "a governmental unit may legitimately restrict the right to participate in its political process to those who reside within its borders."[46]  Other courts have recognized that it is a legitimate purpose for the state to distinguish between the different interests of the geographic areas involved in the election[47] and that the legislature may legitimately restrict the right to vote to those that are most directly affected.[48]  Here, the legislature could rationally determine that when a school district is created at the request of a city or interlocal agreement participants, that the residents within that city or cities will be most directly affected by the creation of the new school district.  The legislature could rationally

---

[46] *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978).

[47] *St. Louis County, Mo. v. City of Town & Country*, 590 F.Supp. 731, 739 (D. Mo. 1984) ("It is a legitimate purpose for [the state] to distinguish between the different interests of the geographic areas involved in annexations.").

[48] *See, e.g., St. Louis County*, 590 F.Supp. at 739 ("The legislature could have rationally determined that residents of the annexing municipality and the area to be annexed are most directly affected by an annexation."); *Givorns v. City of Valley*, 598 So. 2d 1338, 1340 (Ala. 1992) ("A rational basis for the restriction in the challenged statute exists.  The franchise was limited to residents in the area annexed because it was rationally determined that this area would be the area most directly affected."); *City of New York v. State*, 557 N.Y.S.2d 914, 917 (N.Y. Sup. Ct. 1990) *aff'd* 561 N.Y.S.2d 154 (1990) ("In a 'single shot' referendum, the issue to be submitted to the electorate must be analyzed in terms of whether its adoption or rejection will have a disproportionate impact, or be of special interest, to an identifiable group of voters.  If such is the case, and the classification between those who are specially interested and those who are not is reasonably precise, the latter class may be validly excluded from the franchise.").

determine that the interests are different when the decision to create a new school district comes by way of school board action or citizen initiative.  After all, only those residents within the boundaries of the new school district will be responsible for establishing that school district and only those residents will be subject to the decisions made within that district.  Limiting the right to vote to those on the east side promotes a legitimate governmental interest of limiting the vote to those who are most interested in the outcome.  Therefore, the Court finds that the statute, on its face, survives a rational basis review.

    2.    *As Applied Challenge*

    At oral argument, Plaintiffs emphasized that, in addition to their facial challenge, they are also challenging the statutory scheme as applied.  Plaintiffs argue that the disparate economic impact of the legislation on the west side residents of the Jordan School District violates the Equal Protection Clause.  Plaintiffs have abandoned their seventh claim for relief, which alleges violations of various disability statutes.[49]  Plaintiffs incorporate their argument in relation to the disability statutes into their economic impact argument.  Plaintiffs argue that the need to provide adequate accommodations to the disabled students on the west side will have an additional economic impact.  The Court's previous discussion relating to Plaintiffs' facial challenge is equally applicable to Plaintiffs' as-applied challenge and is incorporated into the discussion below.

---

    [49]The Court will grant summary judgment to Defendants on Plaintiffs' seventh claim for relief.  The abandonment of this claim also resolves the dispute concerning the Evans Affidavit and the Burningham Affidavit.  As a result, the Court will deny the motions to strike (Docket Nos. 64 and 73) related to those Affidavits.

a.      *Standard of Review*

The first question to be addressed is what standard of review is applicable to the statutory scheme.  Plaintiffs argue that strict scrutiny is the appropriate standard.  Defendants, on the other hand, argue that rational basis review is applicable here.

"Unless a statute being challenged on equal protection grounds 'jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic,' it will be 'presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'"[50]  For social and economic legislation, the Court will employ a rational basis review.[51]

The Court finds that the statutory scheme does not jeopardize the exercise of a fundamental right.  The only right to which Plaintiffs may point as a fundamental right is the right to vote.  However, as discussed above and in the Court's Injunction Order, on the voting rights issue the statutory scheme is subject to a rational basis review, not strict scrutiny.   As noted, the statutory scheme is "one which restricts the vote to those who reside within the relevant jurisdiction"[52] and is, thus, "subject to a rational basis review."[53]

Plaintiffs also attempt to categorize education as a fundamental right.  However, this argument has been rejected by the Supreme Court.  In *San Antonio Independent School District*

---

[50]*Coal. for Equal Rights, Inc. v. Ritter*, --- F.3d ---, 2008 WL 314675 (10th Cir. Jan. 29, 2008) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)) (citation omitted).

[51]*Id.*

[52]*Herriman City*, 521 F.Supp.2d at 1245.

[53]*Id.*

*v. Rodriguez*,[54] the Court recognized the importance of public education, but noted that education "is not among the rights afforded explicit protection under our Federal Constitution."[55]  From this, the Court finds that the statutory scheme does not jeopardize the exercise of a fundamental right.

Nor does the statutory scheme categorize on the basis of an inherently suspect characteristic.  Here, Plaintiffs do not argue that they are members of a suspect class.  The Court, however, has identified two characteristics which Plaintiffs seem to argue are inherently suspect and are deserving of strict scrutiny: wealth and disability.  As with Plaintiffs' fundamental right arguments, both of these arguments have been rejected by the Supreme Court.  First, in *Rodriguez*, the Court found that wealth was not a suspect class.[56]  Second, in *City of Cleburne*, the Supreme Court found that handicapped persons were not a suspect class for purposes of Equal Protection analysis.[57]  Therefore, Plaintiffs arguments on this ground fail.

Thus, the Court finds that rational basis review is appropriate here and will apply that standard to Plaintiffs' as-applied challenge.  For the reasons stated in its Injunction Order and for reasons stated more fully below, the Court finds that the statutory scheme survives rational basis review.

---

[54]411 U.S. 1 (1973).

[55]*Id*. at 35.

[56]*Id*. at 29.

[57]*City of Cleburne*, 473 U.S. at 446.

b.      *What is the Relevant Jurisdiction?*

The Court previously held that "states are free to restrict elections to those who reside within the relevant jurisdiction."[58]  The Court found that the relevant jurisdiction in this case was the East Side School District.[59]   Plaintiffs argue that relevant geographic area is not limited to the East Side School District but is, in fact, the entire Jordan School District.  In their Memorandum in Support of Motion for Summary Judgment, Plaintiffs emphasize two cases: *Evans v. Cornman*[60] and *Little Thunder v. South Dakota*.[61]

In *Evans*, individuals challenged a county determination that individuals living on the grounds of a National Institutes of Health federal enclave within the boundaries of the state of Maryland did not meet the Maryland residency requirements and thus, were not allowed to vote in county elections.[62]  The Court rejected the argument that these individuals were not residents of Maryland.  The Court found that the NIH residents would be affected by a number of electoral decisions, including: criminal laws, spending and taxing decisions, and unemployment and workmen's compensation laws.[63]  Additionally, these individuals were "required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State;"[64] they

---

[58]*Herriman City*, 521 F.Supp. 2d at 1245.

[59]*Id*.

[60]398 U.S. 419 (1970).

[61]518 F.2d 1253 (8th Cir. 1975).

[62]398 U.S. at 419–20.

[63]*Id*. at 424.

[64]*Id*.

18

were "subject to the process and jurisdiction of State courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools."[65]  From this, the Court concluded that in their day-to-day affairs, these individuals were just as interested in state elections as those who lived outside of the federal enclave and that they were entitled to vote.[66]  "In nearly every election, federal, state, and local, for offices from the Presidency to the school board, and on the entire variety of other ballot propositions, appellees have a stake equal to that of other Maryland residents."[67]

*Little Thunder* concerned a system in which unorganized counties were attached to organized counties.  The "organized county [had] a full complement of elected county officials whose task it [was] to administer the affairs of local government. . . . The unorganized counties, however, [did] not elect these officials for themselves but rather [were] attached to an adjoining county for purposes of government and administration."[68]  The officials in the organized counties "administer[ed] the affairs of the attached unorganized counties and [had] all the powers and duties with regard to the attached county that they have in their own."[69]  Under the statutes challenged in that case, "[t]he residents of the unorganized counties . . . [were] not permitted to

---

[65]*Id.*

[66]*Id.* at 426.

[67]*Id.*

[68]518 F.2d at 1254.

[69]*Id.*

vote for the county officers in the organized county to which their county [was] attached.  Thus, plaintiffs [could not] vote for most of the elected county officials who govern[ed] them."[70]

The Eighth Circuit Court of Appeals recognized that a state may impose geographic limits on the franchise, but that "those limits must bear a close relationship to the underlying interest of the parties affected in the results of the elective process.  Geographic residency requirements are permissible when they are designed to insure that only voters who have a substantial interest in the outcome of elections will participate."[71]  The court held, that those living within the boundaries of the unorganized counties had "a substantial interest in the choice of county officials since those officials govern their affairs."[72]  The court concluded "that although a state might constitutionally set up bona fide geographic lines as they relate to the organization of local government, they may not, through residency requirements, disenfranchise citizens who have a substantial interest in the choice of those who will function as their elected officials."[73]

Both *Evans* and *Little Thunder* stand for the proposition that when establishing the relevant geographic area the state may not exclude those who have a substantial and ongoing interest in the outcome of the election.  In making this determination, the Courts in *Evans* and *Little Thunder* looked at the impact of the election on the excluded individuals over the long-term.  In both cases, the individuals who were not permitted to vote had a substantial interest in

---

[70]*Id*. at 1254–55.

[71]*Id*. at 1256.

[72]*Id*.

[73]*Id*. at 1257.

the election because those elections decided who would be making decision on those substantial issues affecting their daily lives.  Emphasis was placed on the fact that long-term governance was at issue.

While the Court noted, in its Injunction Order, that the creation of the new school district will have certain ramifications for those outside the new district,[74] there is no evidence that the impact on those citizens will be anywhere near the impact set forth in *Evans* and *Little Thunder*. The creation of the new school district was a limited, single-shot referendum.  It did not involve the election of county officials who would administer the affairs of local government as in *Little Thunder*.  Nor did it involve decisions on issues central to the day-to-day affairs of the residents of the excluded voters as in *Evans*.  Thus, while the Court recognizes that it must consider the affect on those on the west side, the Court finds that even considering this impact those residents do not have a substantial enough interest in the outcome to warrant their inclusion in the election. As noted by the Court previously, the residents within the boundary of the new school district have a greater interest because, after all, they will be tasked with the creation of the new school district and will be subject to the decisions of the district.[75]

Additionally, as noted above, Plaintiffs' arguments concerning the economic impact on them do not raise the level of scrutiny in this case.  Moreover, Plaintiffs' economic impact is highly speculative.  As Intervenor Defendants correctly note, there is legislation which has been passed by the Utah State Legislature that seeks to ameliorate the burden on the west side.[76]  Thus,

---

[74]*Herriman City*, 521 F.Supp. 2d at 1246.

[75]*Id*.

[76]*See* S.B. 48, 57th Leg., Gen. Sess. (Utah 2008).

any economic impact the statutory scheme may have is still uncertain.  Plaintiffs' arguments

concerning this issue are best directed to the legislature, not the Court.

                        c.     *Rational Basis Review*

As has been discussed, the Court finds that rational basis review is the appropriate

review.  Under the rational basis test, the question becomes whether the statutory scheme at issue

bears some rational relationship to a legitimate state purpose.[77]  Plaintiffs argue that even if a

rational basis review is applied, the statutory scheme still fails.

Defendant Intervenors have set forth a number of legitimate state purposes which they

argue the statutory scheme promotes: the creation of community based schools; the creation of

smaller school districts; the formation of school districts which share a common geographic area;

the cooperation between the school district and city government; and avoiding the problems

which arise from large, unattached school districts.

Despite Plaintiffs' arguments to the contrary, it is clear that the statutory scheme furthers

at least some of these interests.  One simple example illustrates this point.  Plaintiffs do not

dispute Defendants' assertion that it is a legitimate state purpose to promote smaller school

districts.  The statutory scheme furthers this interest.  Here, the previous Jordan School District

was one of the largest in the nation.  It has now been split into two separate districts.  While the

East Side District cannot be accurately labeled as "small," it is certainly smaller than the previous

district.  From this, it is clear that the statutory scheme advances at least one legitimate interest:

the creation of smaller school districts.  Therefore, the Court finds that the statutory scheme

survives a rational basis review.

---

[77]*Holt*, 439 U.S. at 70.

IV.  MOTION FOR ATTORNEY'S FEES

In their Motion for Summary Judgment, Intervenor Defendants request the Court award attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988(b) and (c).  Intervenor Defendants make no argument in support of their motion and Plaintiffs have not responded.

A prevailing party may be awarded attorney's fees in an action brought pursuant to 42 U.S.C. § 1983.[78]  "A prevailing defendant in a civil rights action may recover attorney's fees under 42 U.S.C. § 1988 if the suit 'was vexatious, frivolous, or brought to harass or embarrass the defendant.'"[79]  "This is a difficult standard to meet, to the point that rarely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff.  The dismissal of claims at the summary judgment stage does not automatically meet this stringent standard."[80]

The Court finds that Plaintiffs' suit is not frivolous, vexatious, or brought to harass or embarrass Defendants and Intervenor Defendants.  Rather, this case presents complex and novel legal issues.  As such, an award of attorney's fees is inappropriate.  Therefore, the Intervenor Defendants' Motion will be denied.

V.  CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion for Summary Judgment (Docket No. 57) is DENIED. It is further

---

[78]*See* 42 U.S.C. § 1988(b).

[79]*Utah Women's Clinic, Inc. v. Leavitt*, 136 F.3d 707, 709 (10th Cir. 1998) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 n.2 (1983)).

[80]*Mitchell v. City of Moore*, 218 F.3d 1190, 1203 (10th Cir. 2000) (citations omitted).

ORDERED that Defendants' and Intervenor Defendants' Motions for Summary Judgment (Docket Nos. 58, 61, and 67) are GRANTED.  It is further

ORDERED that Plaintiffs' and Intervenor Defendants' Motions to Strike (Docket No. 64 and 73) are DENIED.  It is further

ORDERED that Plaintiffs' Motion to Strike (Docket No. 69) is DENIED AS MOOT.

The Clerk of the Court is directed to enter judgment in favor of Defendants and Intervenor Defendants and against Plaintiffs and close this case forthwith.

DATED   March 14, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge